UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

JESSE E. MOODY, JR.,

       Plaintiff,

v.                                Case No. 3:18-cv-661-J-34JRK

MIKE WILLIAMS, et al.,

       Defendants.

_____

## ORDER

### I.    Status

Plaintiff Jesse Moody, an inmate of the Florida penal system, initiated this action on May 17, 2018, by filing a pro se Civil Rights Complaint under 42 U.S.C. § 1983 (Complaint; Doc. 1). In the Complaint, Moody names the following individuals as Defendants: (1) Sheriff Mike Williams; (2) Mike Bruno, Director of Operations of the Duval County Jail (Jail); (3) T.S. Morris, Jail Chief; and (4) Lieutenant M. Forbrich. He asserts that Defendants violated his federal constitutional rights when they subjected him to a variety of unlawful jail conditions from May 2016 through July 2017, and ignored his pleas for corrective action. Moody seeks compensatory and punitive damages as well as declaratory relief.

Before the Court is Defendants' Motion for Summary Judgment (Motion; Doc. 62). In support of the Motion, Defendants submitted the following exhibits (Mot. Ex.): (A) Morris' declaration; and (B) transcript of Moody's deposition. Moody filed a response to the Motion; see Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment (Response; Doc. 70), with the following exhibits (Resp. Ex): (A) Moody's

declaration; (B) Florida Model Jail Standards; and (C) Williams' answers to Moody's interrogatories. Defendants filed a brief in reply. See (Reply; Doc. 75). This motion is ripe for review.

## II.    Moody's Allegations

In his verified Complaint,[1] Moody asserts that he was a pretrial detainee at the Jail from May 8, 2016, until March 21, 2017, when he became a convicted and sentenced state prisoner still housed at the Jail until he was transferred to the Florida Department of Corrections (FDOC) on July 31, 2017. Complaint at 11. He avers that while he was housed at the Jail, Defendants violated the Fifth, Eighth, and Fourteen Amendment by subjecting him to the following unlawful conditions:   (1) an inadequate grievance procedure;[2] (2) an extra bunk in each cell; (3) deficient air circulation; (4) an insufficient number of showerheads; (5) no daily cleaning of the showers; (6) faulty plumbing; (7) foul toilet odors; (8) rodent and insect infestation; (9) no access to a water fountain; (10) no pillow or pillowcase; (11) no window to the outside world;[3] and (12) no access to televisions, radios, or newspapers. Id. at 4-10. According to Moody, he complained about the sub-par conditions in grievances submitted to Defendants, but they failed to take corrective action. Id. at 11. Moody maintains that the "combined effect" of him "suffering

---

[1] See Stallworth v. Tyson, 578 F. App'x 948, 950 (11th Cir. 2014) (citations omitted) ("The factual assertions that [the plaintiff] made in his amended complaint should have been given the same weight as an affidavit, because [the plaintiff] verified his complaint with an unsworn written declaration, made under penalty of perjury, and his complaint meets Rule 56's requirements for affidavits and sworn declarations.").

[2] On October 25, 2018, the Court partially granted Defendants' motion to dismiss as to Moody's due process claims related to the Jail's grievance procedures. See Doc. 19.

[3] Moody asserts that he was moved to a dormitory that had windows on March 21, 2017. See Complaint at 11.

under the 12 unlawful conditions of confinement on a daily basis created a substantial risk to his health and safety" and caused him to experience the following ailments: "frequent moods of deep depression, constant thoughts of suicide, heightened levels of anxiety, bodily ailments, throat soreness, headaches, and physical pain in his neck and knees." Id. at 13.

### III.    Summary Judgment Standard

Rule 56 instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 Fed. Appx. 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986), in order to discharge this initial responsibility." Gonzalez v. Lee Cty. Hous. Auth., 161 F.3d 1290, 1294 (11th Cir. 1998). Instead, the moving party simply may demonstrate "that there is an absence of evidence to support the nonmoving party's case." Id.

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995)

(citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

Of course, "pro se pleadings are held to a less stringent standard than pleadings drafted by attorneys and will, therefore, be liberally construed." Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998). However, "a pro se litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to avert summary judgment." Brown v. Crawford, 906 F.2d 667, 670 (11th Cir. 1990). Although courts show leniency to pro se litigants, courts "will not serve as de facto counsel or 'rewrite an otherwise deficient pleading in order to sustain an action.'" Nalls v. Coleman Low Fed. Inst., 307 Fed. Appx. 296, 298 (11th Cir. 2009) (quoting GJR Invs., Inc. v. Cnty. of Escambia, 132 F.3d 1359, 1369 (11th Cir. 1998) (overruled in part on other grounds as recognized in Randall v. Scott, 610 F.3d 701, 709 (11th Cir. 2010)).

## IV.    Applicable Law

With respect to the appropriate analysis in a conditions of confinement case involving a pretrial detainee, the Eleventh Circuit "historically" has "treated convicted prisoners' Eighth Amendment claims and pretrial detainees' Fourteenth Amendment claims identically." White v. Cochran, No. 16-17490-G, 2017 WL 6492004, at *2 (11th Cir. Nov. 27, 2017) (citation and footnote omitted). Notably, the Eleventh Circuit has explained:

> The Supreme Court stated in Kingsley v. Hendrickson[5] that the language of the Eighth Amendment's Cruel and Unusual Punishment Clause and the Fourteenth Amendment's Due Process Clause "differs, and the nature of the claims often

---

[5] Kingsley v. Hendrickson, 576 U.S. 389 (2015).

> differs." 135 S.Ct. 2466, 2473-76 (2015) (adopting a different test to evaluate pretrial detainees' excessive-force claims than the test used to evaluate convicted prisoners' excessive-force claims). However, we recently stated that Kingsley "is not squarely on point with and does not actually abrogate or directly conflict with" precedent outside of the context of an excessive-force claim. See Dang ex rel Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (quotations omitted).

White, 2017 WL 6492004, at *2 n.1. While the Eighth Amendment does not apply to pretrial detainees, see Nam Dang by & through Vina Dang v. Sheriff, Seminole Cty. Fla., 871 F.3d 1272, 1279 (11th Cir. 2017), the standard for providing basic human needs and a safe environment to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments. Id.; see Goodman v. Kimbrough, 718 F.3d 1325, 1331 n.1 (11th Cir. 2013) ("Regardless of the particular taxonomy under which we analyze the case, however, the result is the same, because 'the standards under the Fourteenth Amendment are identical to those under the Eighth.'") (citation omitted); Johnson v. Bessemer, Ala., City of, 741 F. App'x 694, 699 n.5 (11th Cir. 2018) (stating that Kingsley v. Hendrickson, involving a pretrial detainee's excessive force claim, "does not undermine our earlier Eighth Amendment deliberate indifference precedents").

The Eleventh Circuit has described the requirements for an Eighth Amendment violation as follows:

> "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones ...." Farmer, 511 U.S. at 832, 114 S.Ct. at 1976 (internal quotation and citation omitted).[6] Thus, in its prohibition of "cruel and unusual punishments," the Eighth Amendment requires that prison officials provide humane conditions of confinement. Id. However, as noted above, only those conditions which objectively amount to an "extreme deprivation" violating

---

[6] Farmer v. Brennan, 511 U.S. 825 (1994).

> contemporary standards of decency are subject to Eighth Amendment scrutiny. Hudson, 503 U.S. at 8-9, 112 S.Ct. at 1000.[7] Furthermore, it is only a prison official's subjective deliberate indifference to the substantial risk of serious harm caused by such conditions that gives rise to an Eighth Amendment violation. Farmer, 511 U.S. at 828, 114 S.Ct. at 1974 (quotation and citation omitted); Wilson, 501 U.S. at 303, 111 S.Ct. at 2327.[8]

Thomas v. Bryant, 614 F.3d 1288, 1306-07 (11th Cir. 2010). The Eighth Amendment also requires prison officials to "take reasonable measures to guarantee the safety of the inmates." Farmer, 511 U.S. 832 (quoting Hudson v. Palmer, 468 U.S. 517, 526–27 (1984)). However, not every injury that a prisoner suffers as a result of a prison condition necessarily equates to a constitutional violation. See Goodman, 718 F.3d at 1333. Only injuries that occur as a result of a prison official's deliberate indifference rise to the level of an Eighth Amendment violation. See Farmer, 511 U.S. at 834.

> To survive summary judgment in a case alleging deliberate indifference, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." Carter v. Galloway, 352 F.3d 1346, 1349 (11th Cir. 2003) (per curiam) (internal quotation marks omitted).

Goodman, 718 F.3d at 1331 (footnote omitted); see Johnson, 2018 WL 3359672, at *3 (stating that, to prevail on a deliberate indifference claim, a plaintiff must satisfy (1) the objective component; (2) the subjective component, i.e., that the prison official acted with deliberate indifference; and (3) the causation requirement). A plaintiff who claims deliberate indifference must prove: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." Melton v.

---

[7] Hudson v. McMillian, 503 U.S. 1 (1992).
[8] Wilson v. Seiter, 501 U.S. 294 (1991).

Abston, 841 F.3d 1207, 1223 (11th Cir. 2016) (per curiam) (citations and footnote omitted); see Scott v. Miami Dade Cty., 657 F. App'x 877, 883 (11th Cir. 2016) (stating that "a plaintiff must allege facts that would allow a jury to conclude that: the defendant actually knew that the plaintiff faced a substantial risk of serious harm" (subjective component), and "the defendant disregarded that known risk by failing to respond to it in an objectively reasonable manner" (objective component)).

The Eleventh Circuit has explained the requirement of deliberate indifference to a substantial risk of harm as follows:

> Proof of deliberate indifference requires a great deal more than does proof of negligence: "To be deliberately indifferent a prison official must know of and disregard 'an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Purcell, 400 F.3d at 1319-20 (emphasis supplied) (quoting Farmer v. Brennan, 511 U.S. 825, 837, 114 S.Ct. 1970, 1979, 128 L.Ed.2d 811 (1994)).[9]
>
> In other words, a plaintiff in [Moody]'s position must show not only that there was a substantial risk of serious harm, but also that [Defendants] "subjectively knew of the substantial risk of serious harm and that [they] knowingly or recklessly disregarded that risk." Hale, 50 F.3d at 1583 (alteration omitted) (internal quotation marks omitted).[10] Whether prison officials had the requisite awareness of the risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Farmer, 511 U.S. at 842, 114 S.Ct. at 1981 (citation omitted). At the same time, the deliberate indifference standard - and the subjective awareness required by it - is far more onerous than normal tort-based standards of conduct sounding in negligence: "Merely negligent failure to protect an inmate from attack does not justify liability under [§] 1983." Brown v.

---

[9] Purcell v. Toombs Cty., Ga., 400 F.3d 1313 (11th Cir. 2005).
[10] Hale v. Tallapoosa Cty., 50 F.3d 1579 (11th Cir. 1995).

Hughes, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam). And needless to say, to defeat a motion for summary judgment, [a plaintiff] must adduce specific evidence from which a jury could reasonably find in his favor; "[t]he mere existence of a scintilla of evidence in support of [his] position will be insufficient." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.

Goodman, 718 F.3d at 1332 (emphasis deleted).

## V.      Analysis and Conclusions

In the Motion, Defendants argue that they are entitled to summary judgment for three reasons. First, none of Moody's claims, individually or taken together as a whole, establish a constitutional violation. Motion at 2. Second, Defendants assert that they are entitled to qualified immunity in their individual capacities. Id. Third, they contend that the record contains no evidence establishing liability against Defendants in their official capacities. Id. Defendants also maintain that Moody is not entitled to compensatory or punitive damages because he failed to establish that he suffered more than de minimus physical injury. Id. at 11-12. The Court will address these arguments separately.

### A.      Whether Moody Established Constitutional Violations

In the Motion, Defendants argue that Moody has failed to provide any evidence that they denied him adequate food, clothing, shelter, sanitation, medical care, or personal safety. Id. at 14. Defendants aver that Moody's complaints about the prison conditions at the Jail do not rise to the level of a constitutional deprivation. Id. According to Defendants, "[a]t best, the record evidence demonstrates that the conditions at the [the Jail] were unpleasant or even uncomfortable for Plaintiff," but "[t]he record contains no evidence of any objective constitutional violation." Id. at 16. Additionally, Defendants contend that there is no record evidence to suggest that they acted with a sufficiently

culpable state of mind to have been deliberately indifferent to the conditions of Moody's confinement or that other than Forbrich they were even aware of these alleged conditions. Id. at 16-18. Defendants also note that Moody never required medical treatment for any of his alleged injuries. Id. at 17. The Court analyzes Moody's prison condition claims below.

<u>Overcrowding - Extra Bunks, Lack of Shower Heads, and Poor Air Circulation</u>

In the Complaint, Moody alleges there was an "unlawful extra bunk in each cell" in violation of the Florida Model Jail Standards (FMJS) which prescribe the square feet per person per cell. Complaint at 5. Moody maintains that the Jail cells were designed to house only two people but the addition of the third bunk resulted in a "lack of mobility, lack of sufficient purified air, increased conflicts between the Plaintiff and others in the cell, and limited use of the cell's facilities and storage that caused the Plaintiff to experience breathing problems and elevated levels of anxiety." Id. at 12. Likewise, Moody asserts that there were insufficient shower heads per person as required by the FMJS. Id. at 5. According to Moody, due to the overcrowding he "was not always able to take a shower" and was faced with "a serious risk to his safety because of frequent physical confrontations with other detainees over shower usage." Id. at 12. Moody also asserts that the Jail had inadequate air circulation because there was only an exhaust duct in each cell that took air out of the cell and the only vents pumping air in were located outside the cells in the dormitories. Id. at 6. He maintains that the FMJS requires "a certain amount of cubic feet of air circulation per person in sleeping area cells," but that the Jail was not in compliance with this regulation. Id. Moody believes the cells should have both an exhaust and air vent. Id. Due to this alleged poor circulation, Moody asserts that he

suffered frequent headaches, unwanted serious safety risks, and breathing and sinus issues. Id. at 12.

Defendants argue in the Motion that it is undisputed that the total inmate capacity for the Jail was 3,092 inmates and the Jail never exceeded that capacity, and, therefore, the Jail was not overcrowded. Motion at 14. Moreover, they argue that overcrowding alone is not a constitutional violation and Moody has failed to present any probative evidence that he was denied reasonably adequate food, clothing, shelter, sanitation, medical care, or personal safety because of the alleged overcrowding. Id. Defendants argue that the Jail "was found to have adequate ventilation at all times Plaintiff was incarcerated" and that Moody has provided no evidence to suggest otherwise. Motion at 3. In support, they cite to the June 8, 2017 inspection report reflecting the same. Motion at 3; Mot. Ex. A. Moody argues in his Response that Defendants "have not presented dispositive evidence that mechanical ventilation systems provided a minimum of 10 cubic feet of purified re-circulated air per minute for each detainee in the cells of [the Jail]." Response at 3. Moody contends that exhibit three of Morris' declaration, Mot. Ex. A, states that at the time of the June 8, 2017 inspection, the maximum rated capacity was 2,189 detainees, but that same report also listed the average daily population for the preceding twelve-month period at 2,423 detainees. Id. at 2. As such, Moody argues that Defendants' own exhibit refutes their contention that the Jail was not overcrowded and contradicts Morris' declaration that the Jail has the capacity to hold 3,092 detainees. Id. at 3.

To the extent Moody relies on the FMJS, the Court notes that even if jail "conditions may well fall short of the Florida Model Jail Standards," the Court's "limited authority does not extend to the question whether the defendants have comported themselves in

11

accordance with state law; that is a question for another day, and probably for another court." Saunders v. Sheriff of Brevard Cty., 735 F. App'x 559, 565 (11th Cir. 2018). Instead this Court must focus solely on "the rights that the United States Constitution guarantees, and whether the [Jail] fell short of constitutional requirements . . . ." Id. In other words, a violation of the FMJS will not support a constitutional violation unless it creates an inhuman condition. Overcrowding in a cell, or a prison generally, does not violate the Eighth Amendment unless it leads to violence or the deprivation of essential food, medical care, or sanitation. Rhodes v. Chapman, 452 U.S. 337, 348 (1981); see also Parrish v. Alabama Dept. of Corr., 156 F.3d 1128, 1129 n.1 (11th Cir. 1998) (noting "that overcrowding is not necessarily a violation of a federal right."); Evans v. St. Lucie County Jail, 448 F. App'x 971, 975 (11th Cir. 2011) (finding no constitutional violation where two additional inmates were placed in the plaintiff's cell such that it was at double capacity). "[A] prisoner's mere discomfort, without more, does not offend the Eighth Amendment." Chandler v. Crosby, 379 F.3d 1278, 1295 (11th Cir. 2004).

Moody testified in his deposition[11] that overcrowding was his biggest issue with the conditions at the Jail. Mot. Ex. B at 19. He stated that the Jail had an extra third bunk in his cell and that three people, including himself, slept in his cell. Id. at 20, 32. Moody

---

[11] Moody provided a declaration in support of his Response to the Motion, some of which contains statements that contradict his earlier deposition testimony. See Resp. Ex. A. "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984). Moody has not explained why his contradictory declaration statements should be considered over his unambiguous deposition testimony. Accordingly, to the extent Moody's declarations conflict with his deposition testimony, the Court finds the deposition testimony to be credible and will rely on that testimony in analyzing the merits of his claims. See id.

admitted he suffered no physical injuries from the overcrowding and stated that it was "more so a mental thing as far as just being in a cell with too many people." Id. at 32. Moody also testified that he suffered no physical injury related to the amount of shower heads but that he did suffer mental and emotional pain because it was stressful for him to not take a shower at a certain time as he did not want to miss showers. Id. at 43. When asked to explain, Moody asserted that the stress arose from the potential of "getting in a conflict with dudes about taking a shower." Id. at 34. However, Moody never sought nor received psychological treatment for his stress. Id. at 34-35. Moody maintained at his deposition that the air quality at the Jail was poor. Motion Ex. B at 29. He stated that the recycled air caused sinus problems for him. Id. at 28-30. However, Moody admitted he never submitted a sick call request for his sinus issues and never received a medical diagnosis that those sinus issues were caused by the air in the Jail. Id. at 30-31.

The June 8, 2017 inspection report reflects a maximum rated capacity of 2,189 detainees, with an average daily population for the preceding twelve months of 2,423 detainees. Mot. Ex. A at 54. However, this report also states that at the time of the inspection there was a population of 1,958 detainees. Id. Regardless of this discrepancy, the Court finds Moody has failed to establish a constitutional violation because he has not demonstrated that, even assuming the Jail was overcrowded, that he was deprived of essential food, medical care, or sanitation or that he was subjected to violence.

At best, Moody has described conditions that resulted in his discomfort, which is insufficient to establish a constitutional violation. Each inmate in the cell had a mattress and access to sanitation supplies. Moody suffered no serious medical condition, either physical or mental, particularly in light of the fact that he never sought medical attention

13

for his alleged medical needs. See Daniel v. U.S. Marshall Service, 188 F. App'x 954, 962 (11th Cir. 2006) (finding plaintiff did not prove that he had an objectively serious medical need where he never sought medical treatment for the alleged injuries even though he was free to do so). Based on Moody's testimony and the record available to the Court, it is evident that at the time of the alleged incidents Moody did not believe the emotional and mental stress resulting from the conditions at the Jail posed a serious risk. Regarding showers, he complains that he was unable to take a shower when he wanted to do so. However, he admits he was not deprived of the ability to shower rather he was not allowed to take a shower on the schedule he wanted. This is hardly a constitutional violation because Defendants afforded him the opportunity to shower and provided him with cleaning supplies if he felt the conditions of a shower on a specific day were such that it needed cleaning. Moody's inability to shower at a specific time chosen by him is insufficient to establish a Fourteenth Amendment violation. Likewise, Moody's complaints concerning air circulation do not show a constitutional violation. The alleged failure of the air circulation to comport with the FMJS is not the same as saying the conditions of his confinement are inhumane. Moody admits that there are vents throughout the Jail and exhaust pipes taking air out of the cells. Although there may not be vents inside the cells, he does not allege that the heating and cooling system was inoperable only that he was not receiving fresh air pumped directly into his cell. The Court finds this is not an inhumane condition of confinement. The inspection reports Defendants provided demonstrate that the HVAC system itself operated normally and that it was in compliance with FMJS standards. Mot. Ex. A at 39-40. In light of the record evidence, the Court finds Moody has

failed to satisfy the objective component of a deliberate indifference claim and, therefore, the Motion is due to be granted as to these claims.

<u>Unsanitary Showers, Faulty Plumbing, and Foul Odors</u>

According to Moody, Defendants did not clean the showers daily. Complaint at 7. Although the Jail provides cleaning supplies for the toilets in their cells, the "detainees in general population were not permitted to handle the chemicals that were required to clean the showers." <u>Id.</u> Moody maintains that the FMJS requires that showers be cleaned every day, but Defendants failed to comply with that regulation. <u>Id.</u> Moody asserts that the lack of daily cleaning exposed him to harmful diseases and germs, which caused him "to suffer and endure frequent bodily ailments and was a serious risk to his health and safety." <u>Id.</u> at 12. Additionally, Moody contends that the Jail had foul odors, so much so that he had to place a paper bag over the toilet to act like a lid "in an attempt to block the foul odor that continually emitted from the toilet." <u>Id.</u> at 8. Additionally, Moody asserts that the toilets in the holding cells smelled especially bad but he did not have the option to cover the toilet. <u>Id.</u> Moody maintains that these odors caused him to suffer frequent headaches, sore throats, and sinus problems. <u>Id.</u> at 12. Moody avers that the Jail had a faulty plumbing system that compelled him and other inmates "to place a constructed device over the water sprout [sic] in the cells to prevent water from shooting out onto the floor." <u>Id.</u> at 7. Additionally, he states that many of the sinks in the cells were clogged and did not drain properly. <u>Id.</u> at 7. Moody alleges that on November 8, 2016, one of the devices he used to contain the water leaks fell off, causing water to spill onto the floor, which in turn caused Moody to slip and hit his knee on the toilet. <u>Id.</u> at 7, 12.

In the Motion, Defendants contend that it is undisputed that during the period of Moody's detention in the Jail that the dorms and showers were cleaned regularly and that he, along with all other detainees, were provided with cleaning chemicals and supplies, including deodorizer. Motion at 15. Moreover, Defendants assert that Moody could have requested the "harsher chemicals" used to clean the shower weekly if wanted to do additional cleaning. Id. As such, they maintain that the Jail was not so unsanitary to create a constitutional violation. Id. Defendants also argue in the Motion that "it is undisputed that Plaintiff had only 3 plumbing related issues in his cell during the relevant timeframe," and while these incidents may have resulted in temporarily unsanitary conditions, these isolated incidents do not rise to the level of a constitutional violation. Id. at 14. Moreover, Defendants characterize the issue with the sink leaking when both hot and cold water are used as a "self-imposed plumbing issue" that does not violate the Constitution. Id. at 14-15.

In his Response, Moody avers that he was neither provided with enough cleaning supplies to clean the showers daily nor did Defendants clean the showers daily as required by Florida law. Response at 4. According to Moody, Morris' statement in her declaration about the usage of cleaning chemicals on each floor is conclusory because she did not present facts that these chemicals were actually used to clean Moody's cell or dormitory. Id. Moreover, Moody argues that the fact Morris attached the sanitation policies to her declaration only shows what should have been done, not what was actually done while he was housed in the Jail. Id. Regarding the odors, Moody again reiterates that the toilets and holding cells smelled bad and that the issue was never addressed while he was in the Jail. Id. at 5. Moody also contends that Defendants admit through

their exhibits that there was a "plethora of plumbing issues" around the time Moody was in the Jail. Id. at 4.

According to Moody's deposition testimony, the toilets in the Jail constantly smelled like feces and the holding cells used while awaiting court dates smelled particularly bad. Mot. Ex. B at 24, 46-50. Moody maintains that the odors caused him runny noses, headaches, and sinus and breathing problems, id. at 45-46, although he never sought treatment for these conditions while at the Jail, id. at 45, 50. He testified that during his various periods of incarceration throughout his life he had been housed in at least ten other prisons or jails, but none of them had the foul odors that he smelled in the Jail. Id. at 46-48. In his deposition, Moody admitted that the showers were cleaned twice a week, but he believed they should have been cleaned every day because vomit or blood would sometimes be in the showers. Id. at 22-23. Notably, Moody acknowledged that the Jail provided detainees with cleaning supplies, but said those supplies were not given every day. Id. at 27.

Additionally, Moody testified that when someone in the cell next to his would flush the toilet, the feces from that toilet would appear in the toilet in his cell. Id. at 27. However, they were only allowed to flush their toilet twice in a thirty-minute span. Id. at 32. Additionally, Moody asserted that the sink in his cell leaked when he would turn on the hot and cold water at the same time. Id. at 38-39. So much so, that he had to place a Styrofoam cup over the "sprockets" to keep the water from spilling out onto the floor. Id. One day, water pressure shot the cup off and water began to shoot out all over the floor and as he tried to fix it, he slipped and hit his right knee into the toilet. Id. at 40-42. Moody stated that he did not seek medical attention for the pain in his knee while at the Jail and

waited ten months before requesting treatment once he was transferred to prison. Id. at 43-44. He testified that he never needed anything stronger than Ibuprofen to handle the pain and that medical staff in the prison took an x-ray but determined Moody did not need an MRI. Id. at 43-45. Notably, Moody stated that before his detention in the Jail, he had injured his right knee, and he acknowledged that it was possible the aches and pain he feels in his knee are related to his previous injury. Id. at 75-76.

Concerning the conditions of the shower, the Court finds the evidence does not support Moody's contention that the showers were unsanitary such that their condition violated his constitutional rights. Moody admits the showers were cleaned twice a week and that he was provided with cleaning supplies he could have used if he thought the cleanliness of the shower was not up to his personal standards. Based on these facts, it cannot be said that Defendants deprived of him of the right to take a clean shower or that the shower conditions posed a substantial risk to Moody's health. Likewise, Moody's claim concerning the smell from the toilets and the alleged faulty plumbing does not amount to a constitutional violation. As to the condition of the toilets and the smell they created, the Eleventh Circuit has previously held in an unpublished opinion that "having to use a toilet which lacks proper water pressure and occasionally overflows is unpleasant but not necessarily unconstitutional," and "[a]ny unsanitary conditions caused by the toilet here were mitigated by the provision of cleaning supplies to [the plaintiff]." Alfred v. Bryant, 378 F. App'x 977, 980 (11th Cir. 2010). The Court finds this opinion persuasive and analogous to the instant case. It is undisputed that Defendants provided Moody with cleaning supplies regularly. Similarly, Moody does not allege that his toilet was unable to flush away the feces, only that they were limited in the amount of times they could flush the

toilet. Thus, although there may have been a temporary moment in which feces remained in the toilet, Moody could have flushed it within a reasonable time frame. As such, Defendants provided Moody with a means to mitigate any unsanitary condition that could have arose from the plumbing issues.

Regarding Moody's alleged slip and fall incident with the sink, the Court finds these allegations do not rise to the level of a constitutional violation. "[S]lippery floors constitute a daily risk faced by members of the public at large." Reynolds v. Powell, 370 F.3d 1028, 1031 (10th Cir. 2004). Indeed, the slippery conditions caused by the sink cannot be considered extreme nor do they pose an unreasonable risk of serious injury. Moody's claim that Defendants knew the floor was wet and failed to properly clean it does not establish conduct that constitutes more than mere negligence. See Winston v. Aducci-Washington, Case No. 7:17-cv-01099-VEH-SGC, 2018 WL 2272940, at *6 (N.D. Ala. Apr. 19, 2018) report and recommendation adopted, No. 7:17-cv-01099-VEH-SGC, 2018 WL 2266955 (N.D. Ala. May 17, 2018) (collecting cases finding slip and fall accidents failed as a matter of law to state a federal claim); Davis v. Corr. Corp. of Am., No. 5:07-cv-279-RS-EMT, 2008 WL 539057, at *3 (N.D. Fla. Feb. 22, 2008) ("Courts have regularly held that slip and fall accidents do not give rise to federal causes of action."). Indeed, Moody has alleged nothing more than ordinary lack of due care, which is insufficient to establish a deliberate indifference claim. Additionally, the Court finds that Moody's decision not to seek medical attention for the ailments allegedly caused by these conditions demonstrates that he did not have a serious medical condition. See Daniel, 188 F. App'x at 962. Accordingly, in light of the above analysis, the Court finds that the Motion is due to be granted as to Moody's claims concerning these conditions because he failed to

establish that these conditions objectively amounted to an "extreme deprivation" violating contemporary standards of decency.

Rodent and Insect Infestation

Moody alleges in the Complaint that he observed cockroaches in the floor drains and gnat-like insects flying inside the dormitories, particularly in the holding cells. Complaint at 8. He also avers that there were unknown types of insects in the sleeping areas. Id. Moody asserts that he suffered unidentified "bodily ailments" and the situation "created a serious risk to his health and safety." Id. at 12. In the Motion, Defendants argue that it is undisputed that the Jail had regular pest control. Motion at 15. Moody counters in his Response that Defendants provided no "detailed facts that [the Jail] was free of vermin during the Plaintiff's stay at [the Jail]." Response at 5.

In his deposition, Moody testified that he personally observed roaches and big gnat-like insects flying around the Jail. Motion Ex. B at 51. Moody was unaware if they ever bit him, but testified they buzzed around him. Id. at 53. He acknowledged that officials had the Jail sprayed for insects but asserted that he would continue to see insects every day. Id. at 51-53. Specifically, he testified that he would see a few roaches a day but quite a few gnats, about ten a day. Id. at 53-54. Additionally, Moody stated that he saw either a mouse or a rat twice while he was in confinement on the sixth floor of the Jail for twenty days. Id. at 52-53. However, he testified that he was not really concerned about the rodents and was mainly worried about the insects. Id. at 53. According to Moody, he never suffered physical injuries from the insects or rodents, but it left him with emotional injuries. Id. at 54. However, he also testified that he has never been diagnosed with an emotional

injury or needed treatment for his emotional issues arising from his interaction with the insects. Id. at 54.

Rodents and insects are something the general public deals with on a regular basis in their own homes. Moody's allegations of seeing a mouse or a rat two times and hearing the buzzing of ten gnats a day does not constitute "extreme deprivation" of basic human needs. It is undisputed that the Jail had regular insect-control treatment. Accordingly, the Court finds that the Jail did not have a rodent and insect infestation that would amount to a constitutional violation. Moreover, Moody did not seek treatment for any alleged injuries arising from this condition; therefore, he has failed to establish the existence of an objectively serious risk or medical need. See Daniel, 188 F. App'x at 962. As such, Moody has failed to establish the existence of objectively unconstitutional condition of confinement; therefore, the Motion is due to be granted as to this claim.

<u>Lack of Safe Drinking Water</u>

In the Complaint, Moody maintains that the Jail did not give him access to safe drinking water from a water fountain. Complaint at 9. According to Moody, he "had no other option but to drink from a shared sink and/or shower that contained bacteria of other detainees' excrements." Id. When he grieved this matter, Forbrich responded that water is not required to be filtered and that the Jail's water source comes from an approved existing public supply." Id. Moody avers that as a result of drinking the Jail's water from a sink or shower he experienced constant throat soreness and "other undiagnosed health problems," which he does not identify. Id. at 12.

Defendants assert in the Motion that drinking from a sink instead of a fountain is not a constitutional violation. Motion at 15. In his Response, Moody asserts that

Defendants did not provide him safe drinking water through a water fountain and that the water tests from inside the Jail "do not cover the relevant time frame the Plaintiff was housed inside of [the Jail]." Response at 5. Moreover, Moody contends that these water tests did not use water samples from his cell or the showers he used. Id.

Moody testified in his deposition that the shower water caused skin issues for him and the drinking water gave him sore throats every day. Mot. Ex. B at 24, 54-55. Regarding the skin issues, Moody asserted that it was like ringworm, where a circular rash would form on his back and legs. Id. at 36-37. According to Moody, there were no water fountains in the Jail; instead, the inmates had to drink from the sinks in their cells or from the showers. Id. at 24, 56. He specifically testified he did not drink out of the toilet. Id. Despite his medical issues, Moody stated that he never submitted a sick call for treatment and had never been diagnosed by a doctor with any issue related to the Jail's water or for his skin issue. Id. at 37, 55.

While the deprivation of drinking water for several days would be a denial of the basic minimal necessitates of life, this is not what Moody has alleged in the Complaint or what the evidence demonstrates. Moody admits he had access to drinking water via a sink, as such he was not deprived of drinking water. The fact that the drinking water came from a sink and not a fountain is immaterial to the Court's constitutional analysis of this claim. It is the fact that Moody had regular access to drinking water that controls here. See Leonard v. City of Columbus, No. 4:10-CV-60-CDL-MSH, 2010 WL 3717251, at *6 (M.D. Ga. July 29, 2010), report and recommendation adopted, No. 4:10-CV-60 CDL, 2010 WL 3716877 (M.D. Ga. Sept. 13, 2010) (finding no constitutional violation where plaintiff had to obtain drinking water from a sink in a bathroom and not from a water

fountain). To the extent Moody contends the drinking water is unsafe, the evidence reflects that the water the Jail provided was from the same source the general public used for their drinking water and the local utility company tested the water in February of 2017 and found it to have an acceptable range of contaminants. Mot. Ex. A at 4. As such, it can hardly be said that Moody was deprived of a basic human right when he received the same quality of water that the public at large did. See Jinks v. Medlin, No. CV 313-068, 2015 WL 4716050, at *23 (S.D. Ga. Aug. 7, 2015), report and recommendation adopted, No. CV 313-068, 2015 WL 5359558 (S.D. Ga. Sept. 14, 2015) (finding no constitutional violation where prison water was same water used by the local citizens and tested). Moreover, Moody never sought medical treatment for his alleged injuries even though he was free to do so; therefore, the Court finds he has failed to establish the existence of an objectively serious risk. See Daniel, 188 F. App'x at 962. In light of the above, Moody has failed to demonstrate the objective component of a deliberate indifference claim and, therefore, the Motion is due to be granted as to these claims.

No Pillows

Moody alleges in the Complaint that Defendants failed to provide him with a pillow and pillowcase, as required by the FMJS. Complaint at 9. According to Moody, Defendants' failure to provide these items "is proof that the defendants were deliberately indifferent to the health of the detainees under their care." Id. Moody maintains that he suffered "constant neck cramps and sleeping disorders" because he did not have a pillow. Id. at 13.

In the Motion, Defendants argue that lack of a separate pillow when a bed has a built-in pillow does not violate the Constitution. Motion at 15-16. Moody contends in his

Response that he never admitted he was given a pillowcase and the built-in pillow is merely a "raised cushion" that is not equivalent to a pillow. Response at 5-6. To the extent Defendants argue the built-in pillow is considered best practice, Moody asserts that he has a received a separate pillow with pillowcase in every other prison or jail in which he has been housed. Id. at 6.

Moody testified in his deposition that he did not have a separate pillow with pillowcase; however, he conceded that he received a mattress with a built-in pillow. Mot. Ex. B at 20, 60. According to Morris, he wanted a separate pillow because the built-in pillow was like "a raised cushion," id. at 62, and the lack of a pillow exacerbated previous neck and shoulder injuries, id. at 62-6. Although, he admitted he did not seek medical treatment for this ailment while at the Jail. Id. at 64. While Moody did not have a separate pillow with pillowcase, it is undisputed that there was a pillow built into the mattress, which is the functional equivalent of a standalone pillow. Moody's discomfort from not being able to use a separate pillow does not amount to a constitutional violation. See Chandler, 379 F.3d at 1295 ("[A] prisoner's mere discomfort, without more, does not offend the Eighth Amendment."). Moreover, the fact Moody did not seek medical attention for his alleged injuries also cuts against his allegations that the lack of pillows constituted an objectively serious risk. See Daniel, 188 F. App'x at 962.  Accordingly, this condition, when viewed objectively, does not violate the Constitution and, therefore, the Motion is due to be granted as to this claim.

### Lack of Windows

In the Complaint, Moody asserts that many of the cells in the Jail either did not have windows at all or, if they did, the window-view was obstructed, "which prevented

detainees from viewing the outside world." Complaint at 10. According to Moody, the lack of an outside view made his cell "comparable to a modern day dungeon." Id. Moody alleges that not having "views to the outside world caused the Plaintiff to experience constant anxiety and sensory deprivation which lead to frequent thoughts of suicide and perpetual moods of deep depression which also created a serious risk to the Plaintiff's health and safety." Id. at 13.

Defendants assert in the Motion that lack of a window is not a constitutional violation. Motion at 15. Particularly so because Moody is not complaining that his cell lacked adequate light, merely that he did not have a view to the outside world. Id. In the Response, Moody avers that his windowless dormitory from September 20, 2016, to March 21, 2017, was similar to being housed in a dungeon. Response at 6. During this period, he claims that his mental health deteriorated and he "was not allowed the opportunity to participate in recreation a substantial amount of time during his stay . . . ." Id.

In his deposition, Moody testified that the lack of windows in his cell led him to have suicidal thoughts, but he never actually harmed himself. Mot. Ex. B at 64-66. Moody acknowledged that jail records reflect that he was examined for his suicidal thoughts on September 27, 2015. Id. at 64-65. However, other than that exam, he had no further medical examinations and did not receive treatment for any psychological issues related to the lack of windows. Id. at 66. Likewise, he is not currently receiving any psychological treatment. Id. at 67. According to Morris' declaration, Moody's cell did not have a window but all lighting in the cell worked and Morris states that Moody was afforded opportunities to be outdoors during his recreation time. Mot. Ex. A at 5.

Based on these facts, the Court finds the lack of a window in Moody's cell did not violate the Constitution. Moody does not allege that he had no light in his cell, only that he did not have access to natural light from within his cell. Indeed, the evidence demonstrates that Moody's cell had adequate lighting that passed inspection. Although Moody may not have been able to participate in recreational activities a "substantial amount of the time during his stay" he did have some access to it. As such, the Court finds that the lack of a window in his cell did not deprive Moody of essential human needs. See Poulin v. Jeter, No. 6:08-cv-299-ORL-31KRS, 2010 WL 3701384, at *10 (M.D. Fla. Sept. 15, 2010) (finding no constitutional violation where cell had no window, but had adequate lighting otherwise and plaintiff could access the outdoors). Accordingly, Moody has failed to establish the lack of a window amounted to an objectively unconstitutional condition and the Motion is due to be granted as to this claim.

No Access to Television or other Media

Next, Moody complains that Defendants did not permit him access to televisions, radios, and newspapers. Complaint at 10. He claims that Defendants' policy of not allowing detainees access to these materials "is an exaggerated response to a security need . . . ." Id. In support, Moody asserts that other jails and prisons allow detainees and inmates to have access to media. Id. Moody maintains that his knowledge that other prisons allowed access to these materials while the Jail did not resulted in constant anxiety and sensory deprivation that lead to frequent thoughts of suicide and perpetual depression. Id. at 13. In the Motion, Defendants contend that the Jail's failure to provide television, radio, or newspaper is not a constitutional violation. Motion at 16. Moody

argues in his response, that Defendants admitted they did not provide him access to a television, radio, or newspaper. Response at 6.

Moody testified during his deposition that inmates were not allowed access to a television or radio. Mot. Ex. B at 20-22. Although, he acknowledges he had no constitutional right to those things, id. at 67-68, Moody believes this lack of entertainment in combination with his other allegations created unconstitutional prison conditions, id. at 68. Jails and prisons are not required under the Constitution to guarantee access to television and other forms of media as these simply are not necessities of life and are recreational in nature. As such, it cannot be said that not giving detainees access to these constitutes a deprivation of a basic human necessity. See Harris v. Thigpen, 941 F.2d 1495, 1511 (11th Cir.1991) ("The Constitution does not require that prisoners, as individuals or as a group, be provided with any and every amenity which some person may think is needed to avoid mental, physical, and emotional deterioration."); Elliott v. Brooks, 188 F.3d 518, 518 (10th Cir.1999) (unpublished) ("There is no constitutional right to watch television."). Accordingly, Moody has failed to establish a constitutional violation and, therefore, the Motion is due to be granted as to this claim.

Conditions Considered as a Whole

"Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." Wilson v. Seiter, 501 U.S. 294, 304 (1991) (emphasis in original). However, "[n]othing so amorphous as 'overall conditions' can rise to the level of

27

cruel and unusual punishment when no specific deprivation of a single human need exists." Id. at 305. The Court notes that "[i]nmates cannot expect the amenities, conveniences and services of a good hotel." Harris v. Fleming, 839 F.2d 1232, 1235 (7th Cir.1988).

Here, Moody has failed to establish that any one of the conditions about which he complains by themselves are objectively unconstitutional conditions. These conditions did not prohibit Moody from receiving constitutionally adequate shelter, food, security, medical care, or sanitary conditions. Likewise, when considered as a whole Moody has failed to demonstrate that these conditions worked in concert to deprive him of an identifiable human need. Indeed, as discussed above, Moody has failed to show that he was deprived of food, shelter, medical care, or sanitary conditions. In sum, Moody has failed to produce sufficient evidence that these conditions, either considered alone or cumulatively, posed a substantial risk of serious harm to him or amounted to the extreme deprivation of basic human necessities. It follows then that Moody has not demonstrated that Defendants had a subjective knowledge of a risk of serious harm either if he cannot establish the existence of an objectively serious risk. Accordingly, Defendants' Motion is due to be granted on this claim.

### B.    Qualified Immunity

Defendants argue that they are entitled to summary judgment in their favor as to claims brought against them in their individual capacities based on the doctrine of qualified immunity. Motion at 18-22. According to Defendants, none of the conditions Moody complains about can objectively be considered a constitutional violation. Id. at 19. Moreover, even if Moody had established unconstitutional conditions of confinement,

Defendants maintain that these alleged violations were not clearly established. Id. As such, Defendants contend qualified immunity shields them from individual liability in this suit. Id.

The Eleventh Circuit has stated:

> The qualified-immunity defense reflects an effort to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." Keating v. City of Miami, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted).

> As a result, qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). But the doctrine's protections do not extend to one who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." Harlow v. Fitzgerald, 457 U.S. 800, 815 (1982) (internal quotation marks and alteration omitted).

> To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority. Maddox v. Stephens, 727 F.3d 1109, 1120 (11th Cir. 2013). As we have explained the term "discretionary authority," it "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, it is clear that Defendant Officers satisfied this requirement, as they engaged in all of the challenged actions while on duty as police officers conducting investigative and seizure functions.

> Because Defendant Officers have established that they were acting within the scope of their discretionary authority,

> the burden shifts to [the plaintiff] to demonstrate that qualified immunity is inappropriate. See id. To do that, [the plaintiff] must show that, when viewed in the light most favorable to him, the facts demonstrate that Defendant Officers violated [Plaintiff's] constitutional right and that that right was "clearly established ... in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant officers' actions. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled in part on other grounds by Pearson, 555 U.S. 223, 129 S.Ct. 808. We may decide these issues in either order, but, to survive a qualified-immunity defense, [the plaintiff] must satisfy both showings. Maddox, 727 F.3d at 1120–21 (citation omitted).

Jones v. Fransen, 857 F.3d 843, 850-51 (11th Cir. 2017). The Court notes that where the alleged conditions are particularly egregious, a general constitutional law already identified in decisional law may be applicable such that a reasonable officer would know that the egregious conditions violate the Constitution. Taylor v. Riojas, No. 19-1261, 2020 WL 6385693, at *1 (U.S. Nov. 2, 2020).

Here, as the Court explained in greater detail above, none of the conditions Moody complains of, either singularly or when considered as a whole, violate the Constitution. Moreover, Moody has failed to demonstrate that any of these alleged constitutional violations, in light of the context of this case, were clearly established. As such, the Court finds that Defendants are entitled to qualified immunity as to Moody's claims against them in their individual capacities. The Motion, therefore, is due to be granted as to Defendants' claims of entitlement to qualified immunity.

## C.    Official Capacity Liability

To the extent Moody sues Defendants in their individual capacity, they argue that he is actually suing the city of Jacksonville (City). Motion at 22-23. Defendants argue that Moody must therefore establish that a constitutional violation occurred, and that the City

had an official custom or policy that was the moving force behind the alleged constitutional violation. Id. Defendants also maintain that Moody has failed to establish any constitutional violations and has likewise failed to demonstrate the City had a custom or policy that was the moving force behind the alleged constitutional violations. Id.

A suit against a government official in his or her official capacity is a suit against the entity of which the officer is an agent. Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991). A government entity may be liable in a § 1983 action "only where the [government entity] itself causes the constitutional violation at issue." Cook ex. rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla., 402 F.3d 1092, 1116 (11th Cir. 2005) (citations omitted). Thus, a plaintiff must establish that an official policy or custom of the government entity was the "moving force" behind the alleged constitutional deprivation. See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 693-94 (1978).

In Monell, the Supreme Court held that local governments can be held liable for constitutional torts caused by official policies. However, such liability is limited to "acts which the [government entity] has officially sanctioned or ordered." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). Under the directives of Monell, a plaintiff also must allege that the constitutional deprivation was the result of "an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law." Denno, 218 F.3d at 1276 (citations omitted); see Hoefling v. City of Miami, 811 F.3d 1271, 1279 (11th Cir. 2016) (stating Monell "is meant to limit § 1983 liability to 'acts which the municipality has officially sanctioned or ordered'"; adding that "[t]here are, however, several different ways of establishing municipal liability under § 1983").

"A policy is a decision that is officially adopted by the [government entity] or created by an official of such rank that he or she could be said to be acting on behalf of the [government entity]." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir. 1997) (citation omitted). The policy requirement is designed to "'distinguish acts of the [government entity] from acts of employees of the [government entity], and thereby make clear that [governmental] liability is limited to action for which the [government entity] is actually responsible.'" Grech, 335 F.3d at 1329 n.5 (quotation and citation omitted). Indeed, governmental liability arises under § 1983 only where "'a deliberate choice to follow a course of action is made from among various alternatives'" by governmental policymakers. City of Canton v. Harris, 489 U.S. 378, 389 (1989) (quoting Pembaur, 475 U.S. at 483-84). A government entity rarely will have an officially-adopted policy that permits a particular constitutional violation, therefore, in order to state a cause of action for damages under § 1983, most plaintiffs must demonstrate that the government entity has a custom or practice of permitting the violation. See Grech, 335 F.3d at 1330; McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Bd. Of Cty. Comm'rs of Bryan Cty., Okla. V. Brown, 520 U.S. 397, 404 (1997) (citation omitted). The Eleventh Circuit has defined "custom" as "a practice that is so settled and permanent that it takes on the force of law" or a "persistent and wide-spread practice." Sewell, 117 F.3d at 489. Last, "[t]o hold the [government entity] liable, there must be 'a direct causal link between [its] policy or custom and the alleged constitutional deprivation.'" Snow ex rel. Snow v. City of Citronelle, 420 F.3d 1262, 1271 (11th Cir. 2005) (quotation omitted). Because Defendants official capacity liability

under § 1983 is the functional equivalent of a suit against the City, Moody must show that an official policy or a custom or practice of the City was the moving force behind the alleged federal constitutional violation.

Upon review, Moody has failed to establish the existence of a constitutional violation. Moreover, Moody has neither identified an official City policy of deliberate indifference nor an unofficial City custom or practice that was "the moving force" behind any alleged constitutional violation. Moody's factual allegations are simply insufficient to sustain a claim that there is either a policy, practice, or custom of denying detainees their constitutional rights. In consideration of the above analysis, the Court finds that Moody has failed to establish a claim that Defendants are liable in their official capacities. Therefore, the Motion is due to be granted on this issue.

### D. Equal Protection Claims

The Eleventh Circuit has explained the requirements of an equal protection claim in a § 1983 suit as follows:

> The Equal Protection Clause of the Fourteenth Amendment requires the government to treat similarly situated people alike. City of Cleburne, Tex. v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). To establish such a claim, a prisoner can allege that: "(1) he is similarly situated with other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest, such as race." Jones v. Ray, 279 F.3d 944, 946-47 (11th Cir.2001) (internal quotations omitted); Damiano v. Fla. Parole & Prob. Comm'n, 785 F.2d 929, 932-33 (11th Cir.1986). If a suspect classification, such as race, or a fundamental right is implicated, a court must apply strict scrutiny to that claim. See Johnson v. California, 543 U.S. 499, 506-07, 125 S.Ct. 1141, 1147, 160 L.Ed.2d 949 (2005) (holding that strict scrutiny is the appropriate standard of review for racial classifications even in the prison context). [. . .] If the allegations do not implicate a suspect class, then a court may evaluate only

whether there was a rational basis for how the plaintiff was treated. See Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

Hernandez, 281 F. App'x at 867. The Court notes that "[e]ven arbitrary administration of [prison regulations], without purposeful discrimination, does not violate the equal protection clause." E & T Realty v. Strickland, 830 F.2d 1107, 1114 (11th Cir. 1987) (citations omitted).

Moody has failed to allege or provide evidence that he is a member of a protected class or that he was being treated differently because of his status as a member of a protected class. Receiving the same treatment as other detainees in the Jail, even if the conditions are different at other institutions does not establish a violation of the Equal Protection Clause where there are no allegations or evidence that the alleged disparate treatment was based on a protected class such as race, religion, or gender. See Jones, 279 F.3d at 946-47. Likewise, he has not proven he is a member of a "class of one." See Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1314 (11th Cir. 2006). Moreover, Moody has not proven the existence of discriminatory intent on part of Defendants. See E & T Realty, 830 F.2d at 1114. Therefore, he has failed to show he is entitled to relief on his Equal Protection claims and the Motion is due to be granted as to these claims.

In light of the above, it is

**ORDERED**:

1.      Defendants' Motion for Summary Judgment (Doc. 62) is **GRANTED**.

2.      This case is hereby **DISMISSED with prejudice**.

3.      The Clerk of Court shall enter judgment in favor of Defendants Williams, Bruno, Morris, and Forbrich; dismiss this case; terminate any pending motions; and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 1st day of December, 2020.

MARCIA MORALES HOWARD
United States District Judge

Jax-8
C:
Jesse E. Moody, Jr. #X02438
Counsel of Record